May it please the court, my name is Eric Severson and I represent Righthaven with respect to the Hohn and DiBiase matters here today. Righthaven requests that this court reverse the district court orders dismissing the Hohn and DiBiase matters for lack of standing. Additionally, Righthaven requests that the Hohn court be reversed regarding its granting of summary judgment for defendant Wayne Hohn on the grounds of fair use. I'd like to start out by talking about the standing issue here today. I think the standing issue could be fairly characterized as being viewed through the prism of contract interpretation. That is, whether or not Righthaven has standing depends upon whether or not Stevens Media effectuated an enforceable copyright assignment to Righthaven, conveying sufficient ownership of exclusive rights in addition to an accrued right to sue on an accrued past cause of action. In this case, the answer is yes for a number of reasons. First, I'd like to start with the assignment documents themselves. Righthaven and Stevens Media entered into an agreement referred to as the Strategic Alliance Agreement. Now this agreement purported to provide a general framework for the dealings between Righthaven and Stevens Media with respect to future contemplated copyright assignments. The other operative documents are the later executed copyright assignments themselves. The district court found that these documents, when read together, are unambiguous and could only be read to mean that Stevens Media had not transferred any of the 106 exclusive rights to Righthaven, and that Righthaven had been merely assigned a bare right to sue. Wasn't the district court simply following the Silvers case? I don't believe the district court properly applied the Silvers case, and here's why. Righthaven and Stevens Media were well aware of the Silvers case and attempted to comply with the Silvers case. The difference here, in the Silvers case, there wasn't questionably just a bare right to sue assigned. Here we have an actual copyright assignment. It seems to me, though, that it looks like form over substance. It looks like an attempt that's too cute by a half to get around Silvers, but it still seems that the purpose was just to get the right to sue in somebody else and hang on to the important stuff. Well, that could be one interpretation. I think if you dive into the documents, an assignment can only take place pursuant to the documents. What was the purpose of this whole thing? It seems that the purpose was just to allow them to sue. That is one of the purposes. The other purpose was to assign the exclusive rights of the assignment, maintain enough exclusive rights to grant Righthaven the ability to sue on the accrued cause of action. What exclusive rights did Righthaven actually have? I apologize for my voice. I have the same affliction this morning, unfortunately. It is our position that Righthaven was assigned all of the 106 exclusive rights. Yes, but they were assigned in a way that tied it all up, the actual. If you look at this transaction and ask, okay, who do I need to go to to acquire rights to do anything with regard to these articles, the answer seems to be Stevens, not Righthaven. Well, I believe the proper analysis here for the standing. There were sequential events that happened here. There was an assignment. Why does the sequence matter? At the end of the day, Stevens is the one that has the power to do anything. How do I care what device or what path was taken to get there? Well, an assignment can only happen by a device. Now, Stevens did have certain. You're telling me they papered the deal. I take as a given they papered the deal, and I've read the papers in this case. At the end of the day, I can't see how Righthaven had exclusive rights as defined under the Copyright Act to do anything. Stevens held on to the strings for anything that counted. Well, those were not unfettered strings. There are countervailing provisions in the Strategic Alliance Agreement. Like paying a dollar? Well, that could be one, but also. That doesn't look to me like much of a real string now. That's what I mean by form over substance. Understood, but we also have Section 15.1 in the Strategic Alliance Agreement, and I think this is very important with regard to the party's intent and how the district court erred in interpreting these documents because 15.1 does say if any of the terms within this agreement render the assignment unenforceable, then that term needs to be stricken and construed in a narrow way to allow this assignment to happen. It seems way too tricked up just to get around the Silvers case, and it just doesn't make it. Let's say I'm a third party, and for some reason or another I get interested in the copyrighted material, and I say, holy cow, I really want to use this. Not in a transformative way, but I really want to use it. To whom do I have to go to get permission, Righthaven or Stevens, to do that? At the time that we're looking at the standing issue, you would have to go to Righthaven. Let's remember that there is a right to terminate pursuant to the agreement that Stevens Media has. That is in there. That is in Section 8. But that termination can only be exercised pursuant to 30 days' notice. So at a bare minimum, you would need to go to Righthaven for 30 days. Now, a term- So is that an exclusive right? What were you trying to accomplish with this whole thing? What was the purpose of this whole thing? The overall purpose is to transfer exclusive rights to Righthaven so that Righthaven may be able to maintain the copyright infringement suit against the defendants, D.B. Ossian-Holmes. There wasn't a crude- So it's to outsource the right to sue is what it is. Well, that is not the only purpose. Righthaven could certainly exploit the rights if it wished to. I think the key- How could Righthaven exploit the rights if Stevens could take them back for a song? Stevens could, but maybe Stevens may not take them back. But, well, that's kind of speculative. If you're going to exploit the rights, you're presumably doing it for a profit motive, and there's no reason why Stevens would pass by the profit motive because the agreement is clearly set up to let Stevens take back whatever it wants. Well, Your Honor is correct. I mean, that is speculative. We do not know in that scenario. I suppose Righthaven's position is the question that really matters is what existed on the date of filing with regard to standing. To this day, Stevens Media has not exercised its right of termination for either of these works. Counsel, I take it that with respect to the Hone case, the question of the review of the fair use defense will turn on the resolution of the standing issue? Correct. In other words, if there is no standing in Hone, then it would be an advisory opinion. Yeah, we'd have to dismiss. As to that claim. Yeah. All right. Okay. Right. All right. Anything further at the moment? One question. Oh, sorry.  Is that defined in the agreement? Or what is the manifest intent of the parties? You're referring to section 15.1? Isn't that the one you sent me to? Yes. The provision that reads, if any provision of this agreement shall be held void or unenforceable in Hone by a court of competent jurisdiction, then such court shall correct the defect in a narrowly tailored manner to approximate the manifest intent of the parties. And to answer your question, manifest intent is not a defined term, but I would advocate that the manifest intent of the parties was to effectuate a copyright assignment to convey the exclusive rights so that right haven could, in fact, bring suit on the Hone and DeBiase matters. I have trouble understanding how that helps your case then, because it says that the intent of this agreement is to accomplish something that couldn't be accomplished directly. I mean, it's a given under Silvers and other cases that you cannot simply assign the right to sue. And so we're now being asked to effectuate exactly the intent that can't be accomplished directly. I think a proper way to read this agreement is the parties are trying to lay out a copyright assignment in a post-Silvers world, and admittedly, there may be countervailing provisions here. With regard to the manifest intent of the parties, I think it's unquestionable that the parties desired right haven to be able to bring suit on these accrued causes of action, a predicate to that being an assignment of the exclusive rights. So what I am arguing is to the extent that there's a provision in here that renders the assignment unenforceable, because it is our position that the clear purpose and intent of these deal documents, both the assignment itself and the strategic alliance agreement, is to effectuate an assignment in compliance with Silvers. That is what the parties are struggling with, and so that is why I believe 15.1 helps us, because to the extent the court says, hey, Stevens Media has too much power here, whether you see it as the exclusive rights never left Stevens Media, or they left Stevens Media, which we contend that they did pursuant to Section 7.2, they left Stevens Media, and then pursuant to license back, there were certain rights licensed back to Stevens Media. To the extent that any of these terms render that effort unenforceable, I think those terms need to be stricken, and if it's to Stevens Media detriment, that's to Stevens Media detriment. We have declarations from both Stevens Media and Right Haven saying, hey, this is unquestionably what we are trying to do. This isn't a situation where we have the parties to the transaction stating, hey, this is not what we intended. This isn't the deal that I struck. That's exactly my concern. The intent, which you say is well documented, is to do something that can't be done directly. Now, what is our role supposed to be in helping parties to accomplish something they can't accomplish directly? I wouldn't agree with that characterization. They are trying to accomplish something here. Yeah, exactly what they're trying to accomplish is what Silver says you can't, to assign the right to sue. What other intent? My first question on this is what intent is there, and I think that was the answer you gave me. Is there another intent that is different from that? There's an intent to assign the copyrights, and there's an intent to – there's two parts to that assignment. Assignment of the exclusive rights and assignment of the accrued cause of action. That's the intent of these deal documents. You may wish to save your time for rebuttal unless you have anything further to offer at the moment. At this point in time, I would like to save my time. You may do so, Counselor. Thank you. You have plenty of time.  Good morning, Your Honors. Pleased to court. My name is Kurt Opsahl, and I represent Defendant Appelli Thomas-DiBiase. Mr. Opsahl, how will you and your co-counsel share time? We'll be splitting it evenly, 10 minutes apiece. Very well. And I will be focusing on ownership and standing issues, while he'll be focusing on the fair use issues. The clerk has set the clock at 10, so that's your time. He will have another 10. Very well. You may proceed. So today I would like to address three issues, one dispositive and two subsidiary issues. The dispositive issue is straightforward. Under the plain language of Section 501B of the Copyright Act, the Silvers v. Stoney Pictures en banc decision of this court, you can't transfer a bare right to sue. It must be accompanied by an exclusive right under Section 106 of the Copyright Act. Now, Wright-Haven speaks a lot about the copyright assignment that was created in this matter, but the assignment is deceptive. It was presented to the court without showing it, the Strategic Alliance Agreement, which actually makes it clear that no copyrights transfer. Of course, the provision is Section 7.2 of the Strategic Alliance Agreement, which answers the question that you had, that to whom does one speak when one gets the assignment? The clear answer is Stevens Media. It says that Stevens Media shall retain the right to exploit and shall have unfettered and exclusive ability to exploit the copyrights, while Wright-Haven shall have no right to exploit the copyrights. Now we're pointed to 15.1 and told that we should, if necessary, strike that provision and recast the agreement to whatever extent is necessary in order to accomplish the goal of assigning the copyright. Should we do that? If not, because I suspect the match is going to be no. It is no. Why not? Well, a couple of reasons. First is the agreement was not ambiguous, and one of the rules of contract interpretation is really you go to the intent when there's ambiguity. But there really was no ambiguity in Section 7.2 to provide. They're not asking us to interpret it. I mean, the phrase is correct the defect. So they're not trying to say this is a matter of what's the meaning of that word. They're trying to say, I'm trying to think of an analogy. It's like states that say long-arm jurisdiction is as long as the Supreme Court will let us take it. Here they're saying, you know, make this assignment whatever it has to be in order to accomplish the goal. Well, I think this is improper. You can have a contract that says the party shall have their cake and eat it too, but it doesn't mean that they can accomplish this. And what they were trying to accomplish with their intent, their stated intent, was exactly that, to have their cake and eat it too. They wanted Wright Haven to have the ability to sue, to have sufficient rights. As they put it in the assignment, it was rights requisite for Wright Haven to be an owner for purposes of suing. They didn't even spell out what rights would be transferred under the assignment. And at the same time, they wanted Stevens Media to enjoy all of the rights ordinarily associated with an owner. So Stevens Media could maintain the licenses that it had provided to third parties. There's a provision in there that allows them to maintain encumbrances on the copyrights as collateral for loans. There are many provisions that remain, even after they attempted to amend it, that show that all along the intent was for Stevens to be the owner and Wright Haven to have standing to sue. But this is an impermissible intention. It's like having a contract saying that, you know, we intend for this contract to be binding despite the lack of consideration. That is not an intent that the court can effectuate. Nor is it proper for the parties to write into a contract and basically ask for judges to rewrite the contract for them. So as a proposition I actually haven't seen before, do you have any authority on that latter subject in terms of the court's role in recasting an agreement? Well, I don't have a specific case. It's sort of like your consideration case. They're not saying the contract is valid without consideration. They're saying the court should figure out how much consideration is necessary to make the contract valid. Well, and so the court's role, you know, there are cases that talk about the court's role with respect to the parties intent and it's to sort of effectuate the provisions and avoid ambiguity if there is one in order to accomplish what was intended. But I don't think that gives any right to accomplish something which is not permitted by law. Now, I don't have a specific case. I'm not aware of any case that has addressed. And actually we looked for cases that directly addressed that point. How about this one? Well, there's this one, yeah. Actually, you know, I can say after there's now a file 275 lawsuits, probably 20 of them or more reached a decision. So there have been numerous decisions by district courts finding that the agreement did not transfer ownership. This same agreement, there are 275 suits with respect to this? There's 275 suits. They filed grand total. Most of them were with respect to Stevens Media and using the same strategic alliance agreement. About 50 were with respect to the media news group publisher of the Denver Post, and those cases were filed in the District of Colorado. That had more or less the same operative language, and the District of Colorado in the Wright Haven v. Wolfe case determined that that did not transfer ownership, and that was briefly appealed to the Tenth Circuit, but then that appeal was dismissed. They prefer our business to theirs, I guess. I guess so. So Wright Haven says that it's speculative what Stevens Media might do, and I would submit that it's not very speculative if you look at the Wright Haven operating agreement. This is the founding document of the company, and the Wright Haven operating agreement says that it was formed for the purpose of acquiring a limited revocable assignment with a license back of copyrights, then to obtain registrations in Wright Haven's own name, file lawsuits as a business, and then after each litigation had ended, the real copyright owner, quote, would ultimately enjoy the copyright registration. So it was the purpose of the company from the very beginning to return these copyrights after the lawsuit was done. So I want to turn briefly to the two subsidiary issues. The first is whether their May Amendment could retroactively change the facts that were in existence when the complaint was filed, and the second is whether the May Amendment actually did change the facts. So recognizing the failure of the Strategic Alliance Agreement on May 9th, 2011, while briefing on this motion was pending, Wright Haven and Stevens Media entered into an amendment to the Strategic Alliance Agreement, but the district court correctly held that Wright Haven was not able to change the facts after the case had been filed because the facts are set, as the Supreme Court explained, in Lujan and Newman Green. The existence of federal jurisdiction ordinarily depends on the fact that they exist when the complaint is filed. See, I like words like ordinarily because that means there's sometimes when that's not the case. Indeed, and I think one example where it might not be the case would be if one alleged an amount of damages that was greater than the diversity jurisdictional limit, but then over the course of discovery, it was determined that, in fact, the damages were below the jurisdictional limit. You don't lose jurisdiction when that occurs. And the Newman Green case also discusses some of the other examples, but none of them pertain to this case where they're trying to change defective facts. So defective allegations can be changed, but not defective facts. So if you put in the wrong address in your complaint, you can amend and correct to put the right address in, but you can't move to another state and then amend to assert your new location. And finally, even if this court were to consider the May Amendment, it's ineffective. It fails because the new agreement still doesn't transfer any ownership rights to Wright Haven. As Judge Pro recognized in the Hain case, it provides only illusory rights. And I guess it's also worth noting that not only are these rights illusory, but with respect to the retroactive grant of a right to exploit, it's meaningless because Wright Haven can't go back and exploit in the past. There's no purpose or advantage of doing that. So the new language in Section 7.2 provides that Wright Haven has to give 30 days advance written notice before exploiting the copyright. And then it made sure that that notice would be given by a set of rather draconian provisions where Wright Haven agreed that failure to give that notice would be a material breach, that it would cause Stevens-Mitty irreparable harm if it didn't give that notice, and Wright Haven would have no right to oppose injunctive relief. And so why was this 30 days so important? Because there were 14 days for Stevens-Mitty to buy back the rights for a nominal fee, ensuring that there was no instance in which Wright Haven could exploit the copyrights without having Stevens-Mitty have the ability to veto that decision. And as I said before, the revised deal left unchanged a number of other provisions that are ownership rights, such as the ability to maintain encumbrances on loans, the right to veto litigation. So in short, the new agreement is just a repapering of the transaction which was designed to allow Wright Haven to sue while yet allowing Stevens-Mitty to remain the owner. Thank you, Counsel. You ended right on the button. Excellent. We'll hear from Mr. Randazza. Yes. May it please the Court, Your Honor. I'm here to introduce myself for the record. Mark John Randazza. I'm here on behalf of Wayne Hain, and I will be arguing the issue of fair use in this case. Do you agree that if we affirm on the basis of standing, then we would have to vacate, would we not? I do not agree, Your Honor. In this case, standing and the merits are intertwined. This is not a matter of subject matter jurisdiction. The Court had subject matter jurisdiction under Section 1331. When you look at a copyright case, you look first just to two elements before you examine any affirmative defenses. You look at whether or not there is ownership of valid interests in order to sustain a copyright case in the plaintiff's name. That's not the same as whether or not the Court had subject matter jurisdiction. So for Judge Proe to have entered that two-part decision was eminently proper. Also, as we've seen with all of this back and forth with the assignments and with what rights are whose, I think Judge Proe properly saw that we may wind up, I don't know how many strategic alliance agreements, amendments, and clarifications we saw below. I think it was three. There probably would have been a fourth and a fifth if remanded. Ultimately, it does not matter because it is fair use, no matter who we look at. Even so, and even in that case, even if Judge Proe should not have issued that second part, if there is a basis for this Court to uphold summary judgment, it should do so if it appears in the record. Well, fair use appears in the record here. Let me recast the question slightly. I'm not trying to say, I don't think Judge O'Connell was suggesting the district court did something improper. But in our consideration, if we conclude on the first issue that your side wins, is there any reason for us to reach the second issue? And if that's the case, is there any reason for the district court's opinion to stand for whatever vitality it has? Because we're not reviewing that issue. I think that you should continue to review it, Your Honor. Because you like it. You want to get to the third issue. Yes, I do. There are no cases yet where somebody has, I mean, frankly, I think just as a matter of illogic, nobody has brought a case trying to hold a party responsible for copyright infringement for taking a news article and adding it to a debate. Well, let's get to that question. How has the nature and character of the article changed at all by posting it on a website? That's exactly the same thing the newspaper does, and it has its comment section. It invites people to participate in the discussion. Your client's taken it and put it on his own website. How is that fair use? Well, there are a couple errors in there. First, it's not his website. But a website that he chooses to participate in. Correct. There is nothing in the record that shows that the newspaper was engaged in the debate market. The newspaper may have published this article, but there is nothing in the record that shows that it was part of an online discussion. Have you ever seen a newspaper that didn't have a letter to the editor's column? Have you ever seen a newspaper website that didn't have a place for comments? I have seen newspaper websites where there's no place for comments, and letters to the editor, Your Honor, would not show the instantaneous and robust debate that we have here. If Mr. Hayne had simply written a letter to the editor to comment on or criticize this article,  Mr. Hayne could have talked about the article, maybe even provided a link to the article. I don't see how reprinting the article transforms it at all. How does it change its nature? It changes it greatly, Your Honor, because it's not simply a reprinting. This is taking the article and opening it up for debate and discussion. This is as if he walked into a VFW with a photocopy of the newspaper. Suppose I take Justice Sotomayor's book, post it, and invite people to comment on it. Can I do that without violating a copyright? I don't believe so, Your Honor. Why not? What's different? What's different is the length of the work, the nature and character of the work. How many paragraphs is too many? Sorry? How many paragraphs is too many? Your Honor, there is no bright line test for that. That's the nice thing about fair use. That's why I think I like this issue. There is a four-part test, and we love four-part tests and tests that we can simply go through a check box and say that this goes in our favor, that goes in our favor, I win. Well, when it comes to fair use, it is an equitable rule of reason. So it should have gone to a jury? No, Your Honor, because Righthaven did not choose to enter any evidence into the record. We have all of the evidence. Be careful what you ask for. What if we decide the judge was wrong? I mean, this is like me posting a performance, the entire performance of Elvis Presley, and saying, okay, now let's comment on it. It's not very transformative. Well, Your Honor, the entire performance of Elvis Presley would be all creative. This is a news article. This is just the kind of thing you would comment upon. But there is a creative aspect to the reporter's drafting of a news article, is there not?  But how do you comment? So what's the difference? I don't understand your point. How do you comment and criticize on an article without the article? Now, that's just to tell him this is just the article. We could have put a link to it. Or report the news, because he's not really conducting a book review critique. This isn't a review of the press. This is important news. News is not copyrightable. The format and expression in which news is conveyed can be. He could have reported the facts contained in the article and asked for comment. And, indeed, I didn't see anything that suggested he was asking for a critique of this particular reporter's style. It was in the midst of a longer political discussion. About what? Which you look at, Your Honor. What was the discussion about, though? It was about the article. It was about the events. It was about the substance of the article. It wasn't about the article. He wasn't asking for a writing critique, was he? No, Your Honor. Okay. But if you look at the transformation, you're looking at the transformation a bit too narrowly. You're saying if he posted the whole article, that's the entire new work. That's not the entire new work. The entire new result is that 40-day discussion that ensued afterwards. That 40-day discussion that would not have existed but for him doing this. Well, it could have existed perfectly well if what he had done was report the facts, reprinted the news. That 40-day discussion wasn't driven by the style of the article. It was driven by the substance of it. But it was a discussion about the opinions expressed in it. This was people essentially debating Sherman Frederick's opinion in this article. So if you have an opinion-based article, you have a community of people online, this is how we communicate. This is how we engage in debate. So if you have this article posted there for these opinions to be criticized, these opinions to be agreed with or argued with, this is the only way you're going to do it. And frankly, this is the only time I've ever seen a case in which the poster of an article was even accused of being liable for a copyright infringement by starting a discussion and debate over an article. This just doesn't happen. With that, Your Honor, I will yield my time. I'll make one observation, which is really meant to be helpful, negative in some fashion. The rules do require certain sections, including a statement of issue and a summary of argument. I didn't find either of those sections in your brief. So the next time you do a Ninth Circuit brief, you might want to check more carefully to make sure you have the pieces. Thank you, Justice Clayton. Thank you, counsel. Mr. Severson, you have some reserve time. Well, to address what we just heard in that version of reality, if that is fair use, then let's think about the logical extension of what will, in fact, happen, particularly to print media such as newspapers and magazines. If what Mr. Hain did is acceptable, then what is to stop me from walking out of this courtroom today, starting a website called Eric Sports, starting a forum? And I'm a big sports fan, so I'm going to wait for that Sports Illustrated to come out this week. I'm just going to cut and paste all the articles about the Ravens' great victory and all that and put it up there wholesale 100 percent. And that's perfectly fine if that version of fair use is allowed to exist. I would contend that that is not what the 107 Fair Use Defense is about, and I would contend that's not the kind of world that copyright owners want to live in, and that's not a world that would be good particularly for the publishing industry. The court picked up on this. There were a number of things that the defendant could have done. He could have taken out a tiny excerpt. He could have posted a link. That's great. That would have sparked debate without using the whole pie of the article because the point of this is if you wanted to see that whole entire editorial article, you would have needed to go to the review journal website. So I think the fair use argument is strongly in our favor here. With regard to the transformative use, I don't think there's any different purpose whatsoever. The market harm factor for the same reasons I think falls squarely in our favor on this. The nature of the work supports the finding of fair use, and finally, the substantiality. The article was taken 100 percent. So with that, unless the court has any further questions for me, we'll go ahead and rest. Very well. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Clifton